MefmemoUNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ELEANOR ANSARI, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.14-30035-KPN |
| | ) | |
| METROPOLITAN LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant | ) | |

MEMORANDUM AND ORDER REGARDING
CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS
(Document Nos. 29 and 33)
December 11, 2014

NEIMAN, U.S.M.J.

Eleanor Ansari ("Plaintiff") brings the instant action pursuant to the Employment Retirement Security Income Act ("ERISA"), 29 U.S.C. § 1001 *et seq*, seeking judicial review of a decision denying her long-term disability benefits ("LTD") by Metropolitan Life Insurance Company ("Defendant"), the issuer and claims administrator of her employer's benefits plan. Count 1 of the complaint concerns the LTD denial and Count 3 concerns damages stemming from that denial. Plaintiff also alleges, in Count 2, that Defendant failed to provide her with adequate documentation of the LTD Plan ("Plan") in violation of 29 U.S.C. § 1132(c)(1)(B).

Presently, Plaintiff moves for judgment on the administrative record, arguing that Defendant failed to provide Plan documentation and that, in any event, Defendant's decision to deny her LTD benefits was neither reasonable nor supported by substantial

evidence. Defendant cross-moves for relief in its favor, contending that its decision was reasonable and adequately supported and, as well, that it had no duty to provide Plan documentation. For the reasons which follow, the court will deny Plaintiff's motion and grant Defendant's motion for judgment on the record.

I. BACKGROUND

A. The Plan

The Plan provides for LTD benefits to certain employees of Verizon Wireless who qualify as disabled. It grants Defendant discretionary authority to interpret its terms, including determining eligibility for and entitlement to Plan benefits. (Administrative Record ("A.R.") at 49, 80.) Employees are disabled under the Plan for the first 24-month "qualifying period" if they cannot earn more than 80 percent of their pre-disability earnings at their *actual occupation* from any employer in the local economy. (Id. at 18.) After those first 24 months, employees, to receive further LTD benefits, are evaluated under a higher disability standard, that is, the inability to earn more than 60 percent of their pre-disability earnings at *any* gainful occupation in the local economy for which they are reasonably qualified. (Id.)

B. Plaintiff's Claim for LTD Benefits

Plaintiff worked as a supervisor at Verizon Wireless, a position that required six to eight hours of standing and walking per day, when she developed a "hammer toe."[1] (Id. at 195, 821.) As a full-time employee, Plaintiff was entitled to participate in its

---

[1]"Hammer toe is 'a condition in which the proximal phalanx of a toe . . . is extended and the more distal phalanges are flexed, causing a clawlike appearance.'" *Marshall v. Colvin*, 2014 WL 4258262, at *4 n.21 (D.N.H. Aug. 27, 2014) (quoting *Dortland's Illustrated Medical Dictionary* at 1959 (31st ed. 2007).

2

disability benefits plan. (Id. at 102.) On February 26, 2010, her podiatrist, Dr. William Axton, performed corrective surgery on her toe. (Id. at 821.) On March 19, 2010, Defendant approved Plaintiff's initial claim for short-term disability benefits; it would ultimately afford her the maximum of 26 weeks of full pay to recover from the surgery, based on her length of service. (Id. at 63, 675.)

Plaintiff's surgery, however, did not cure all of her pain and, in fact, may have caused or aggravated an independent painful condition in the same region of her body. (Id. at 817.) In her fourth post-operative visit with Dr. Axton, she complained that her "left foot [was] still very painful and ting[ling] and numb." (Id.) Dr. Axton noted that she was possibly suffering from chronic regional pain syndrome ("CRPS") in her left foot and referred her to a pain management specialist.[2] (Id.)

On May 7, 2010, Plaintiff's pain management specialist gave her a lumbar sympathetic block injection. (Id. at 344.) She soon returned to Dr. Axton, however,

---

[2]Plaintiff's treating sources, along with both parties, refer to CRPS as "Chronic" Regional Pain Syndrome. Plaintiff's Exhibit "A" to her memorandum in support of judgment on the record, along with other documents in the administrative record, however, define CRPS as "Complex" Regional Pain Syndrome. (Doc. No. 24.) The two variants appear to be interchangeable. *See Lamb v. Barnhart*, 85 Fed. Appx. 52, 56 n.1 (10th Cir. 2003) (referring to "complex or chronic regional pain syndrome"). Accordingly, the court employs CRPS to refer to either title. Incidentally, this malady is sometimes referred to as Reflex Sympathetic Dystrophy Syndrome in the administrative record and elsewhere, but any reference to "RSDS" will be subsumed under the CRPS label. *See* Soc. Sec. Ruling 03-2P, 2003 WL 22399117 (October 20, 2003).
    The court further notes that the Social Security Administration defines CRPS as "a unique clinical syndrome that may develop following trauma. The syndrome is characterized by complaints of intense pain and typically includes signs of autonomic dysfunction." *Id.* at *1. "'[T]here is no specific diagnostic test for CRPS.'" *Gross v. Sun Life Assurance Co. of Canada*, 734 F.3d 1, 24 (1st Cir. 2013) (quoting a CRPS fact sheet prepared by the National Institute of Neurological Disorders and Stroke at R. 03359).

complaining of side-effects from the block and stating that she still suffered pain in her foot. (Id. at 786-787.) Dr. Axton pressed her to retry pain management and noted that she still could not work. (Id.)

On June 1, 2010, Plaintiff saw Drs. William Thompson and Shameema Faruqi, both pain management specialists, who determined that she still suffered from left foot pain "both somatic and neuropathically induced," increased her dose of gabopentin, and suggested physical therapy and the possibility of a future nerve block. (Id. at 343.) She returned again to Dr. Axton on June 18, complaining that she could not stand for more than thirty minutes. (Id. at 778.) Dr. Axton noted that her complaints were consistent with CRPS. Later that month, Plaintiff followed up with Dr. Thompson, who noted that "CRPS type one is likely." (Id. at 587.) Similarly, on August 19, 2010, a third doctor at the pain management clinic, Poornachandra Manikantan, concurred that Plaintiff had "features of neuropathic/CRPS kind of pain in the left foot." (Id. at 338.)

Plaintiff's condition did not improve. Accordingly, Defendant determined that Plaintiff met the requirements for the two-year LTD qualifying period and she began receiving those benefits on August 27, 2010, the day after she exhausted her short-term disability benefits. (Id. at 454, 946.) Defendant thereafter reviewed Plaintiff's condition semiannually and continued to approve her for LTD at the lower, qualifying period, standard. (Id. at 959-62, 977.) On October 8, 2010, Dr. Axton again noted Plaintiff's complaints of pain and maintained his diagnosis of CRPS. (Id. at 577-78.)

On February 28, 2011, however, a bone scan recommended by Dr. Manikantan failed to produce objective evidence of CRPS. (Id. at 437.) And while, on several occasions, Dr. Axton observed inconsistencies in Plaintiff's skin temperature in the

4

affected area -- an objective sign of CRPS -- Dr. Manikantan found that her temperature was "equal bilaterally." (Id. at 332, 540, 542-43.) Dr. Manikantan also recorded that Plaintiff's foot pain increased with activity and decreased with elevation. (Id. at 346.)

On August 13, 2011, nearly halfway through Plaintiff's qualifying period for LTD, the Social Security Administration ("SSA") approved her application for Social Security Disability Benefits ("SSDI") after an initial denial. (Id. at 547, 572.) The SSA found that Plaintiff was disabled starting on July 22, 2011, but, pursuant to SSA rules, was not entitled to collect those benefits until January 2012. (Id. at 548.)[3] Except for Plaintiff's initial denial and subsequent award letters, there is no documentation from her SSDI claim file in the administrative record before the court. (Id.)

As Plaintiff's LTD qualifying period came to a close, the question of whether she would be eligible for permanent LTD began to loom over the horizon. To that end, on February 9, 2012, after several more visits with Plaintiff, Dr. Axton completed a form, titled Physical Capacity Evaluation, provided by Defendant. (Id. at 467-469.) Therein, Dr. Axton produced the following information:

| In an 8 hour day of activity, the patient can: | How many minutes in an hour? | How many hours in a day? |
|---|---|---|
| **Sit** | 20-30 | 4-6 |
| **Stand** | 10-15 | 1-2 |
| **Walk** | 15-20 | 3-4 |
| **Driving Automobile** | 40 | 4-6 |

---

[3]This did not affect Plaintiff's net benefits at the time because her LTD payment exceeded the SSDI benefit.

(Id. at 468.) He also limited her to sitting for two hours a day, standing for an hour a day, and walking for an hour a day -- all intermittently. (Id. at 465.) He opined as well that due to her "painful and unpredictable condition," Plaintiff could "work a total of 0 hours per day." (Id.)

Around that same time, Plaintiff returned to the pain management clinic where she was treated by Drs. Manikantan and Abdullah Abolkhair. (Id. at 331-32.) They diagnosed "[p]ost-surgical pain, question CRPS type 1 of the left foot." (Id.) They also noted that Plaintiff complained of pain of 8/10 severity and had nail polish on her toes on both feet. (Id.)

On April 16, 2012, Defendant called Plaintiff to discuss her ability to return to work. (Id. at 1011-17.) Plaintiff explained that the constant nature of her foot pain would preclude her from working on a full-time basis. (Id.) She also mentioned that, although elevating her foot helped when sitting, it did not eliminate the pain. (Id.)

On August 8, 2012, Defendant referred Plaintiff's file to its clinical department, noting that "[t]he restrictions and limitations need clarification as the available bone scan impression did not reveal a diagnosis of [CRPS] therefore there seems to be little clinical correlation to support [the diagnosis] and restrictions and limitations." (Id. at 1035.) A few days later, Defendant determined that "there were no findings to suggest a [diagnosis] of [CRPS]." (Id. at 1043.) And on August 17, 2012, Defendant's medical director concluded that there were no restrictions or limitations that would prevent Plaintiff from working. (Id. at 1045.) In fact, the medical director concluded, Plaintiff was capable "of working in a sedentary capacity with accommodations of sit to stand for comfort, infrequent walking, lifting 20 pounds occasionally and 10 pounds frequently for

the next 3 months on a full time basis before being reevaluated." (Id. at 1045-46.)

Defendant then forwarded a copy of the medical director's one-page report to Plaintiff's doctors for "clinical information in support of" their own conclusions if they disagreed with the report. (Id. at 355.) The report itself described Plaintiff's surgery and diagnosis by Plaintiff's doctors and then spoke to the lack of objective evidence supporting the diagnosis. (Id. at 356.) Dr. Axton responded with a contrary opinion but did not provide new medical evidence. (Id. at 1070.) Defendant subsequently determined that Plaintiff could work in the local economy and make more than 60% of her pre-disability income and, therefore, was no longer eligible for LTD as of October 8, 2012. (Id. at 229.)

On November 6, 2012, Dr. Axton wrote the following to Defendant:

> I had received a review from your medical director stating there was no evidence to support [CRPS] because she had a negative bone scan. I am in complete disagreement it this statement. There is multiple [*sic*] medical documentation in the literature stating that bone scans do not make a diagnosis of [CRPS]. It is probably positive in only 50 to 55% of the cases.

(Id. at 226.) In response, Defendant sent Plaintiff a letter explaining her right to appeal the decision. (Id. at 1105.)

C. Plaintiff's Appeal

In preparation for the appeal, Plaintiff on July 29, 2013, arranged for an Independent Medical Examination by Dr. Marc A. Linson. (Id. at 195.) Dr. Linson found that she had "[p]ains . . . in the lower back radiating down the left leg with tingling and numbness into the leg and foot" and noted that, although Plaintiff moved carefully and exhibited discomfort, there was no objective evidence of CRPS, such as temperature

7

differential or color changes. (Id.) He continued: "[s]he has no imaging of her low back, no electrodiagnostic studies and lacks on physical examination any or all hallmark features of [CRPS] that would normally be expected to be seen." (Id. at 196.) Accordingly, Dr. Linson found that "it is speculative as to what the source of her pain is and she has not had an appropriate or thorough diagnostic work-up for her difficulties." (Id.) Nevertheless, he concluded that, based on her subjective complaints and the medications prescribed to her, Plaintiff was permanently and totally disabled. (Id.)

On August 7, 2013, Plaintiff formally appealed Defendant's decision ending her LTD benefits as of October 8, 2012. (Id. at 188-189.) On September 13, 2013, at Defendant's request, Dr. Mark Kaplan performed a peer review of Plaintiff's medical records. (Id. at 163-70.) He concluded that Plaintiff's restrictions as of her LTD termination date included "standing and walking to a cumulative total of 2 hours in an eight hour day" but did not restrict or address Plaintiff's ability to sit. (Id. at 169.) On September 16, Defendant sent Dr. Axton a fax requesting "*clinical evidence* in support of [his] conclusions" if he disagreed with Dr. Kaplan's assessment. (Id. at 161.) Dr. Axton responded on September 30th indicating that, in addition to Dr. Kaplan's limitations, Plaintiff was only able to sit intermittently for two hours a day; he did not, however, provide any clinical evidence in support of that opinion. (Id. at 155.) Dr. Kaplan himself never amended his decision to add a sitting limitation. (Id. at 148.)

On October 22, 2013, Defendant, using Dr. Kaplan's restrictions, upheld the termination of Plaintiff's LTD benefits. (Id. at 1137-40.) Defendant explained that "the clinical evidence available for review does not substantiate that the pain was causing [Plaintiff] functional limitations and restrictions which would prevent her from performing

8

alternative sedentary occupations particularly after August 26, 2012." (Id. at 1137-38.) Defendant also specifically noted that "there is no clinical evidence to support [Plaintiff's claim of] inability to sit for longer than two hours per eight hour day." (Id. at 1138-39.)

D. <u>Statutory Violations</u>

Plaintiff's appeal was complicated by her difficulty acquiring Plan documents. On January 9, 2013, her counsel requested the summary plan description and the actual LTD Plan in effect. (Id. at 204.) On February 6th, Defendant sent Plaintiff a "complete copy" of Plaintiff's claim file, advised her counsel that requests for Plan documents should be sent to Verizon Wireless (the Plan administrator), and provided Verizon Wireless's address. (Id. at 221.) On February 11th, Plaintiff's counsel wrote Defendant a letter identical to the January 9th request but including the title "SECOND NOTICE." (Id. at 206.) Defendant responded on February 25th with a letter identical to its February 6th response. (Id. at 208.) Plaintiff asserts that she did not get her claim file until receiving this second letter.

Plaintiff, however, still had not obtained her Plan documents and on March 6, 2013, her counsel again requested them along with a 90-day appeal period extension. (Id. at 215.) At the same time, Plaintiff's counsel made a similar request of Verizon Wireless using the address provided by Defendant. (Id. at 211.) Defendant granted Plaintiff's extension request (see Defendant's Reply to Plaintiff's Statement of Uncontested Facts, Doc. 34, at ¶ 85), but the letter to Verizon Wireless was returned as undeliverable. (A.R. at 212.) Defendant's internal notes on March 11, 2013, reflect that the "Plan info cannot be released by [Defendant]." (Id. at 1107.)

On May 16, 2013, Plaintiff's counsel again wrote Defendant complaining that he

had not received the Plan documents and requesting yet a further extension of the appeal period up to a month after the date he received those documents. (Id. at 209.) Plaintiff renewed this request on July 1, 2013. (Id. at 202.) On July 12, Defendant responded by letter allowing an appeal extension through August 8, 2013, and indicating that it had contacted Verizon Wireless regarding the request for Plan documents. (Id. at 201.) According to the complaint, Plaintiff did not receive a copy of the Plan documents until June 2, 2014, long after the resolution of her appeal (First Amended Complaint, Doc. 19, at ¶ 32).

## II. DISCUSSION

The parties' cross-motions for judgment on the administrative record have been treated by the court as motions for summary judgment. *See Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 24 (1st Cir. 2003). The court addresses each motion separately and draws inferences against each movant as appropriate. *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997). In the end, the court has had to determine "whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002).

A. Counts 1 and 3: 29 U.S.C. § 1132 (a)(1)(B)

Count 1 alleges that Defendant's adverse LTD finding ought not survive this court's review and must be reversed. Count 3, which concerns Plaintiff's entitlement to healthcare reimbursement is, to the extent it may otherwise be viable, dependent on Count 1.

In essence, Plaintiff argues that she provided Defendant ample evidence to overcome any reasonable inference that she was not disabled, that Defendant unreasonably burdened her with providing objective evidence to show that she could not sit, and that Defendant did so without describing the quality and quantity of evidence sought until too late. Defendant responds that its decision was reasonable because Plaintiff did not provide consistent evidence showing that she could not perform sedentary work and that the burden to provide objective evidence to show she could not sit was neither unclear nor unreasonable. Defendant, in the court's view, has the better argument.

1. Standard of Review

The court agrees with the parties that, since the Plan grants Defendant discretionary authority to determine benefit eligibility, the underlying decision with regard to the LTD denial must be reviewed for abuse of discretion, which is equivalent to an "arbitrary and capricious" standard. S*ee Pari-Fasano v. ITT Hartford Life and Accident Ins. Co.*, 230 F.3d 415, 419 (1st Cir. 2000). Accordingly, "an unreasonable determination would necessarily constitute an abuse of discretion, and a reasonable determination necessarily would not." *Id.*[4]

Plaintiff correctly points out, however, that where, as here, a defendant is both plan administrator and underwriter, a court should consider the resulting conflict of interest as a factor when deciding whether a determination was reasonable. *Id. See*

---

[4]Stated otherwise, the court should not approach the question of whether Plaintiff merited LTD benefits *de novo* but, rather, must defer to Defendant's determination to the extent that it is reasonable. *See Leahy*, 315 F.3d at 17.

11

*Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). A conflict may indeed be dispositive in some instances, but the claimant still bears the burden of showing that the structural conflict biased the administrator's decision. *See Cusson v. Liberty Life Assurance Co. of Boston*, 592 F.3d 215, 225 (1st Cir. 2010).

Here, although Plaintiff has raised conflict issues, she has by no means demonstrated any significant impropriety. She has neither identified any colorable bias in the record nor has she suggested that limited discovery might shed light on the issue. *Cf. Sansby v. Prudential Ins. Co. of Am.*, 2009 WL 799468, at *2 (D. Mass. Mar. 25, 2009). At most, Plaintiff, relying on *Nolan v. Heald College*, 745 F.Supp.2d 916, 925 (N.D. Cal. 2010), contends that Defendant failed to properly delineate her burden for proving disability and that this failure supports an inference of prejudice caused by the conflict of interest. (Reply Memorandum in Opposition to Defendant's Motion for Judgment on the Record (Doc. no. 43).) *Nolan*, however, is readily distinguishable; simply put, Defendant did not fail to explain Plaintiff's burden.

More to the point, it is undisputed that Defendant considered all of Plaintiff's evidence, solicited further evidence from her doctors, granted each extension requested, and conducted the appeals process through a different unit than the one which made the initial determination. Accordingly, other than considering it as a factor when analyzing the reasonableness of Defendant's LTD denial, the court will not "accord any special weight to the conflict." *See Cusson*, 592 F.3d at 228.

2. <u>Defendant's Decision</u>

The issue before Defendant, in both its initial and appeal decisions, was whether Plaintiff provided enough evidence of a physical impairment that would preclude

12

sedentary work not, as Plaintiff alleges, whether she simply could sit.  Accordingly, as both parties acknowledge in their briefs, the question of whether Plaintiff actually had CRPS (which may have initially prompted Defendant to closely scrutinize Plaintiff's LTD eligibility) ultimately took second chair to the question of whether she had proven she was disabled.  The court's analysis, therefore, focuses on whether Defendant's benefits decision concerning the issue as framed was a reasonable one.

Plaintiff argues that she provided sufficient evidence that she could not work and that Defendant unreasonably chose to find against her "on the basis of nothing," *i.e.*, without sufficient evidence affirmatively showing that Plaintiff *could* work.  Unfortunately for Plaintiff, this argument ignores the fundamental fact that "[a] *claimant* seeking disability benefits bears the burden of providing evidence that [s]he is disabled within the plan's definition."  *Morales-Alejandro v. Medical Card Sys., Inc.*, 486 F.3d 693, 700 (1st Cir. 2007) (emphasis added).  That misunderstanding aside, the court nonetheless concludes that Defendant reasonably decided that Plaintiff had not met her burden.  In short, there is simply little if any objective evidence in the record that Plaintiff could not sit without pain and, as a result, Defendant could reasonably have concluded that she could work if permitted to change positions from standing to sitting at will.

To be sure, Plaintiff suggests that there is no medical test that identifies when a person can or cannot sit.  (See Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Record (Doc. No. 24), at 7 ("Is there some sort of medical test that identifies when a person can sit or cannot sit?").)  Such a suggestion, of course, cannot carry the day.  Even the absence of a dispositive "test" could not render irrelevant the need for other objective evidence of a claimant's disability; if anything, the need for

objective evidence becomes even more important, providing much-needed ballast to the subjective portions of the record.

Here, much of the record is based not on objective clinical evidence but on Plaintiff's subjective complaints of pain. Not only is there very little evidence supporting Plaintiff's diagnosis of CRPS (see, *e.g.*, Dr. Manikantan's report of a negative bone scan and bilaterally equal temperature (A.R. at 332, 437) and Dr. Linson's explanation that Plaintiff had none of the hallmark signs of CRPS (Id. at 196)), but, more significantly, there is almost no objective evidence that Plaintiff could not work. Granted, the record contains numerous medical entries documenting what Plaintiff told her doctors, such as when she initially complained to Dr. Axton that her "left foot [was] still very painful and ting[ling] and numb," and a few months later when she indicated that she could not stand for more than thirty minutes. (A.R. at 817, 778.) But those notations merely echo Plaintiff's subjective statements and, in any event, would not require any special deference. More than that, Dr. Axton's analysis was internally inconsistent at times; for example, he opined that Plaintiff could only sit for 20 to 30 minutes per hour but could somehow drive for 40 minutes per hour.

Further, what little objective evidence can be gleaned from the record is inadequate to render Defendant's decision unreasonable. For example, Dr. Axton often indicated that Plaintiff walked with an analgesic gait or a mild limp, yet he never noted any need on her part to change positions or recline during office visits. And while Dr. Linson observed that Plaintiff moved carefully and exhibited discomfort, that hardly describes a person who is unable to remain for long in a sitting position. *Compare Gross v. Sun Life Assurance Co.*, 734 F.3d 1, 18 (1st Cir. 2013) (doctor "observed that

[claimant] was 'showing signs of severe pain while seated.'").

Unfortunately for her cause, Plaintiff's treating physicians' opinions, without sufficient objective support, cannot alone compel a decision in her favor. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (rejecting treating physician rule in ERISA matters because, in part, doctors "may favor a finding of 'disabled'"). And given the other evidence of record, Defendant was entitled to rely on its own medical director's opinion that Plaintiff was capable of sedentary work.

Persevering, Plaintiff also argues that Defendant failed to limit hypothetical occupations in the local economy to those that permit elevating a leg while sitting. Accordingly, she asserts, Defendant's decision was flawed. Plaintiff herself, however, did not submit sufficient evidence to Defendant to compel a reasonable person to find that she needed to have her leg elevated when sitting. Accordingly, there was no need for Defendant to limit hypothetical occupations by that metric.

Finally, citing *Nolan*, 745 F.Supp.2d at 925, Plaintiff proffers the argument that, while a claimant is burdened with proving a disability, a plan administrator nonetheless has the duty to explain what will satisfy that burden. Here, Plaintiff argues, Defendant never suggested that she undergo any specific test but, instead, only asked for objective evidence that she could not work; she also contends that Defendant did not ask Dr. Axton to clarify his opinion that she could not sit, nor did Defendant pose the question to other treating sources.

This last argument is creative but unavailing. Even were the court to assume that such duties exist in the First Circuit, it is self-evident from Defendant's requests of her physicians for objective clinical evidence that Plaintiff needed to provide the very

information she now describes to prove her disability. Her failure to adequately do so was hers alone. For all of these reasons, therefore, Defendant is entitled to summary judgment on Counts 1 and 3.[5]

B. Count 2: 29 U.S.C. § 1132(c)(1)(B)

Plaintiff also alleges that Defendant violated the ERISA statute by failing to provide Plan information in a timely manner.[6] The particular provision she invokes provides, in applicable part, as follows:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant . . . by mailing the material requested to the . . . participant . . . within 30 days after such request may in the court's discretion be personally liable to such participant . . . in the amount of up to $100 a day from the date of such failure or refusal.

The problem with Plaintiff's argument is that Defendant was the *claims* administrator, not the Plan administrator. (See A.R. 125 (identifying Verizon as the Plan administrator); *see also Tetreault v. Reliance Standard Life Ins. Co.*, 2011 WL 7099961, *3 n.4 (D. Mass. Nov. 28, 2011).) Since, Defendant itself had no duty to provide the Plan information under this provision, it is entitled to summary judgment on Count 2 as well.

### III. CONCLUSION

---

[5]The court notes that Plaintiff also suggested, for the first time in her reply to Defendant's opposition to her motion, that the denial letter, was faulty for its lack of specificity and "may have violated" section 1133 of ERISA. This claim was not part of her complaint and comes too late to be considered at this time.

[6]Plaintiff, it should be noted, does not assert that the delay in receiving the Plan information thwarted her appeal.

16

For the reasons stated, Defendant's motion for judgment on the record is ALLOWED and Plaintiff's motion is DENIED.

IT IS SO ORDERED.

      /s/   Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge

December 11, 2014